UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| GIZMO BEVERAGES, INC., a Delaware corporation,<br><br>Plaintiff/Counterdefendant,<br><br>v.<br><br>DON L. PARK, an individual, DANIEL PARK, an individual, and RAMBLEWOOD HOLDINGS, LTD., a British Virgin Islands corporation,<br><br>Defendants/Counterclaimants. | Case No. 8:17-cv-01037-JDE<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING TRIAL PURSUANT TO RULE 52(a)<br><br>Trial<br>Date:  September 24, 2018<br>Time:  9:00 a.m.<br>Courtroom: 6A<br>Honorable John D. Early |

The above-entitled action came on for a bench trial on September 24, 25, and 27, 2018. On September 24, 2018, at the close of Plaintiff's case, Defendants made an oral motion "for a nonsuit," which the Court interpreted as a motion for judgment on partial findings under Rule 52 of the Federal Rules of Civil Procedure ("Rule 52"), subdivision (c), and heard on September 24 and 25, 2018. As authorized under Rule 52(c), the Court declined to render any judgment until the close of the evidence. Regardless of whether the Court bases

its findings on the full record of the trial under Rule 52(a) or a judgment on partial findings under Rule 52(c), the Court must make findings of fact and conclusions of law (see Fed. R. Civ. P. 52(a), (c)), and the same standard of review would apply on appeal (see Lee v. West Coast Life Ins. Co., 688 F.3d 1004, 1009 (9th Cir. 2012)).

Pursuant to Rules 52(a) and 52(c) and Local Rule 52-1, based upon the evidence and argument presented at trial and the parties' pretrial and post-trial filings, the Court makes the following findings of fact and conclusions of law.

## I.
## **FINDINGS OF FACT**

1. The Plaintiff/Counterdefendant in this case is Gizmo Beverages, Inc. ("Plaintiff"). Dkt. 79, Final Pretrial Conference Order ("FPTCO").

2. The Defendants/Counterclaimants are Don L. Park ("Don Park"), Daniel Park, and Ramblewood Holdings, Ltd. ("Ramblewood") (collectively, "Defendants"). Id.

3. In approximately 1996, Bernard Frutin filed for intellectual property protection of Gizmo Closure and Delivery Device ("Device"). Id. at ¶ 5(a)(i).

4. In October 2001, Rocept Lusol Holdings, Ltd. ("RLH") filed a trademark application with the European Union's Intellectual Property Office ("EUIPO") for the mark "Gizmo." Id. at ¶ 5(a)(ii).

5. In March 2003, EUIPO registered "Gizmo" as RHL's trademark. Id. at ¶ 5(a)(iii).

6. In June 2005, RLH assigned its patent and trademarks to Gizmo Packaging Limited ("GPL"). Id. at ¶ 5(a)(iv).

7. In November 2007, RHL registered the domain name "www.gizmoclosures.com" with the Internet Corporation for Assigned Names and Numbers ("ICANN"). Id. at ¶ 5(a)(v).

8. In June 2010, Defendant Daniel Park registered the domain name

"www.gizmoclosure.com" with ICANN at the direction of Defendant Don Park. Reporter's Transcript of Proceedings ("RT") 9/25/18, 82:22-25; Exh. 6.

9. Defendant Daniel Park communicated with Bernard Frutin by email several hundred times using the "gizmoclosure.com" email suffix in the first three months after registering it, and Mr. Frutin did not advise that the domain was very similar to the gizmoclosures.com domain or assert it infringed upon a trademark. RT 9/25/18, 147:22-148:22.

10. In September 2010, GPL entered into a Master License Agreement ("Master License") with Ramblewood. FPTCO at ¶ 5(a)(vii).

11. Defendant Don Park is Ramblewood's officer. Id. at ¶ 5(a)(viii).

12. The Master License gave Ramblewood certain rights, including the right to use the domain names "www.gizmopackaging.com" and "www.gizmoclosures.com" (the "Domain Names"). Id. at ¶¶ 5(a)(ix) & 5(a)(x).

13. In May 2011, Defendant Daniel Park registered "www.teaofakind.com" with ICANN. Id. at ¶ 5(a)(xii).

14. At the time Defendant Daniel Park registered the "teaofakind" domain, he was employed by Defendant Don Park; Defendant Daniel Park was never an employee of Plaintiff. RT 9/25/18, 60:24-61:3.

15. The name "Tea of a Kind" was created by Ofer Ashkenazy, who worked for Mr. Don Park at the time; Defendant Don Park approved its creation and paid for the website. Id. 59:16-60:3; 60:16-20.

16. In July 2011, Don Park formed Gizmo Beverages, LLC ("Gizmo LLC"). FPTCO at ¶ 5(a)(xi).

17. At the time of its creation, Gizmo LLC was a single member company owned solely by Defendant Don Park. RT 9/24/18, 161:2-7.

18. At the time Gizmo LLC was created, Defendant Don Park did not transfer the domain names "teaofakind.com" or "gizmoclosure.com" to Gizmo LLC and has never executed a written transfer of those domain names to Gizmo

LLC. RT 9/25/18, 139:25-140:10.

19. In December 2011, Gizmo LLC applied for the trademark "Tea of a Kind" with the United States Patent and Trademark Office ("USPTO"). FPTCO at ¶ 5(a)(xiii); Exh. 8.

20. In January 2012, Ramblewood entered into a sublicense with Gizmo LLC/Plaintiff that gave Gizmo LLC/Plaintiff the right to use the Device's intellectual property rights in connection with beverages (the "Beverage Sublicense"). Id. at ¶ 5(a)(xiv).

21. The Beverage Sublicense also gave Plaintiff the right to use the domain "www.gizmoclosures.com." Id. at ¶ 5(a)(xv); RT 9/24/18, 60:15-25.

22. In November 2012, the USPTO registered "Tea of a Kind" as Plaintiff's trademark. FPTCO at ¶ 5(a)(xvi).

23. In late 2013, Gizmo LLC became a corporation (Plaintiff). RT 9/24/18, 54:6-10.

24. At the time Gizmo LLC became a corporation, Defendant Don Park was the Chairman. Id. 55:12-16.

25. In September 2015, and again in November 2015, GPL sent Ramblewood notice that it was in breach of the Master License. FPTCO at ¶ 5(a)(xvii).

26. In January 2016, GPL sent Ramblewood notice that it was terminating Ramblewood's Master License. Id. at ¶ 5(a)(xviii).

27. After the notice of termination from GPL was received, Walter Apodaca and others spoke with Mr. Frutin, who advised he did not wish to work with Defendant Don Park. RT 9/24/18, 96:12-97:9.

28. In April 2016, after Defendant Don Park resigned from and gave up voting rights to Plaintiff, GPL and Plaintiff entered into a License Agreement (the "New License"). FPTCO at ¶ 5(a)(xix); RT 9/24/18, 98:15-100:16.

29. Under the New License, Plaintiff received the exclusive rights to the

Device's patents, trademarks, and Domain Names. FPTCO at ¶ 5(a)(xx); RT 9/24/18, 102:19-103:15.

30. Walter Apodaca is now Chairman and Chief Executive Officer ("CEO") of Plaintiff. RT 9/24/18, 39:12-20.

31. Defendant Daniel Park created an email account for Mr. Apodaca under the "teaofakind.com" domain at Mr. Apodaca's request, along with a password and user name, which Defendant Daniel Park understands provides Mr. Apodaca full access to that email account. RT 9/25/18, 164:15-165:20.

32. With the "teaofakind.com" email account, Mr. Apodaca could create other email addresses with the same domain name. RT 9/25/18, 166:17-167:3.

33. Plaintiff's representatives requested Defendant Daniel Park to return login information for the "teaofakind.com" domain, but the information was not provided. RT 103:18-104:10; 193:10-14.

34. Neither Defendants Don Park nor Daniel Park are doing any kind of marketing using the "teaofakind" domain. Id. 105:14-16.

35. In June 2016, Defendant Don Park forwarded two emails to Mr. Apodaca from the email addresses associated with "info@gizmoclosures.com." Id. 107:5-25; Trial Exhibit (Tr. Exh.) 13, 14.

36. Plaintiff does not use the domain "gizmoclosures.com" for marketing; the only company that uses that domain is GPL, who is not a party to the action. RT 9/24/18, 190:19-23; 191:16-22.

37. Plaintiff does not use the "gizmoclosure.com" as an email address in any of its current marketing materials. Id. 195:17-20.

38. Plaintiff's CEO is not aware of any email from a potential customer or member of the public that was directed to "info@gizmoclosure.com" that Plaintiff did not ultimately receive. Id. 194:18-22.

39. Prior to the issuance of a preliminary injunction in this case,

Defendant Don Park used a "gizmoclosure" e-mail to conduct business and personal matters. RT 9/25/18, 55:16-56-3.

40. Defendant Don Park caused the creation of the "gizmoclosure" email to have a "similar email" to create a "common bond" with Mr. Futin and GPL's employees, and thereafter, he continued to use the email outside of the business relating to the Device. Id. 57:8-20.

41. Since March 28, 2016, Defendant Don Park has not conducted any business relating to the Device, marketed the Device, created any beverage product, or competed with Plaintiff in any way. Id. 58:1-12; 63:15-23.

42. Defendant Don Park has not used either the "gizmoclosure" or "teaofakind" domain as leverage in the resolution of any dispute with Plaintiff. Id. 64:4-15.

43. Plaintiff seeks only injunctive relief. FPTCO at ¶ 5(a)(xxi).

44. Plaintiff's complaint alleges Defendants committed trademark infringement, cybersquatting, and conversion, by: (a) continuing to use the domain "www.gizmoclosure.com" (i.e. "www.gizmoclosures.com" without the "s") (the gizmoclosure domain); and (b) refusing to turn over the log-in information for the "teaofakind" domain. Id., pp. 4-6.

45. Defendants filed a countercomplaint seeking a judicial declaration that they have not infringed on Plaintiff's trademark rights. Id., pp. 8-9. On September 18, 2017, the Hon. David O. Carter granted in part, and denied in part, Plaintiff's motion for a preliminary injunction, ordering Defendants to immediately cease using the "gizmoclosure" domain pending trial of Gizmo's claims and declining to order Defendants to turn over the log-in information to the "teaofakind" domain without prejudice. Dkt. 36. The finding regarding the "gizmoclosure" domain name was based in part upon the Court's finding that, in the context of opposition the motion, "Defendants expressly concede that 'the goods that are being promoted by both domain names . . . are identical.'" Id. at

7 (quoting Defendants' Opposition to the Motion for Preliminary Injunction at 14). Defendants made no such concession at trial.

## II.
## **CONCLUSIONS OF LAW**

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b). The Court has jurisdiction over Plaintiff's related claim based on state law pursuant to 28 U.S.C. § 1367.

2. Venue is proper with this Court pursuant to 28 U.S.C. § 1391(b) and (c).

### A. Claim One: Trademark

1. "To prevail on its claim of trademark infringement, [Plaintiff] must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon [Plaintiff's] rights to the mark." Dep't of Parks & Recreation for State of California v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006) (citing Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc)).

2. Likelihood of confusion exists "when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 825 (9th Cir. 1993) (internal quotation marks omitted).

3. "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." Dreamwerks Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998).

4. "The confusion must 'be probable, not simply a possibility.'" Murray v. Cable NBC, 86 F.3d 858, 861 (9th Cir. 1996).

5.      "Courts generally consider eight factors in determining whether a likelihood of confusion exists between products bearing an original trademark and allegedly infringing products." SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd., No. CV 15-08157-BRO (Ex), 2015 WL 6680807, at *6 (C.D. Cal. Oct. 19, 2015); see also AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods., 353 F.3d 792, 810 n.19 (9th Cir. 2003).

6.      The eight factors, typically referred to as the Sleekcraft factors, are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1209 (9th Cir. 2012)) (internal quotation marks omitted); see also Sleekcraft, 599 F.2d at 348-49.

7.      The Sleekcraft factors "are intended as an adaptable proxy for consumer confusion, not a rote checklist." Rearden LLC, 683 F.3d at 1209 (citing Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1145 (9th Cir. 2011)).

8.      "Although some factors—such as the similarity of the marks and whether the two companies are direct competitors—will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1054 (9th Cir. 1999).

9.      "In the context of the Web, the three most important Sleekcraft factors in evaluating a likelihood of confusion are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the parties' simultaneous use of the Web as a marketing channel." Interstellar Starship Servs., Ltd. v. Epix, Inc., 304 F.3d 936, 942 (9th Cir. 2002).

10. "When this controlling troika suggests confusion is likely, the other factors must weigh strongly against a likelihood of confusion to avoid the finding of infringement." Id. (internal quotations omitted).

11. However, "[s]ome use of the Internet for marketing, however, does not alone and as a matter of law constitute overlapping marketing channels." Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1151 (9th Cir. 2002). The Ninth Circuit has made clear that the "proper inquiry" when both parties use Internet-based marketing is "whether both parties use the Web as a substantial marketing and advertising channel, whether the parties' marks are utilized in conjunction with Web-based products, and whether the parties' marketing channels overlap in any other way." Id. at 1151-52 (internal quotations and citations omitted).

12. "To constitute trademark infringement, use of a mark must be likely to confuse an appreciable number of people as to the source of the product." Entrepreneur Media, 279 F.3d at 1151 (holding a reasonable juror could find a single instance of confusion to be "de minims" and thus unpersuasive); see also Int'l Ass'n. of Machinists and Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 201 (1st Cir. 1996) ("[T]he law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.") (citations omitted).

13. To determine a mark's strength, it is classified in one of the following four groups, listed in ascending order of strength: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). The stronger the mark, the more protection it is afforded. Sleekcraft, 599 F.2d at 349. The weaker the mark, the less protection it is afforded. Id.

14. The Lanham Act defines "use in commerce" as "the bona fide use

of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. Specifically, "use in commerce" is defined:

> (1) on goods when—
>
>   (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
>
>   (B) the goods are sold or transported in commerce, and
>
> (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

Id.

15. Here, assuming without deciding that Plaintiff had a protectible interest in the asserted trademarks at issue, Plaintiff has not met its burden to show likelihood of confusion.

16. Assuming Plaintiff's protectible ownership in the word "gizmo" (Tr. Exh. 3) and "Tea of a Kind" (Tr. Exh. 8), domain names using those trademarks can support a claim of trademark infringement, if the other elements are met. Compare Perfumebay.com Inc. v. eBay Inc., 506 F.3d 1165, 1174-75 (9th Cir. 2007) (applying the Sleekcraft factors, finding Perfumebay infringed eBay's trademark, noting, among other factors: the similarity of the marks; both parties' use of the same sales channel (the internet); and sale of the same product (perfume)). Assuming similarity of the marks applies in favor of Plaintiff, the remaining applicable Sleekcraft factors favor Defendant.

17. With respect to the first Sleekcraft factor, Plaintiff offered minimal evidence regarding the strength of the marks "gizmo" or "Tea of a Kind." The

word "gizmo" is not inherently distinctive and is arguably the quintessentially generic term for gadget or device. As noted, generic marks carry the lowest level of protection. Assuming trademark protection for "gizmoclosures.com," it lacks distinctiveness and is apparently not used by Plaintiff. "Tea of a Kind" is more distinctive than "gizmo," but Plaintiff offered no evidence the mark is inherently distinctive or has acquired distinctiveness through secondary meaning. Although "advertising expenditures can transform a suggestive mark into a strong mark where, for example, that mark has achieved actual marketplace recognition" (Brookfield, 174 F.3d at 1051 (internal citations omitted)), Plaintiff offered no such evidence here. Thus, neither mark appears particularly strong.

18. With respect to the second Sleekcraft factor, Defendants do not offer any goods that resemble or in any way compete with any goods offered by Plaintiff, and that factor weighs heavily against a likelihood of confusion.

19. As to the third factor, Plaintiff offered no evidence of any actual confusion since June 2016. In or prior to June 2016, Plaintiff pointed to two emails that were forwarded to it by Defendants as the only evidence of consumer confusion. See Tr. Exhs. 13, 14. However, one of those emails was sent by a person known to Defendant Don Park who was seeking an introduction to "your R&D director contact at Nutrilite," which Defendant Don Park passed on Mr. Apodaca; it was not a customer or vendor inquiry about Plaintiff or its products, and it did not suggest any actual confusion by the sender of the email regarding competing goods. See Tr. Exh. 13. The other email, which was an unsolicited business inquiry sent to the "info@gizmoclosure.com" account, was forwarded by Defendant Don Park to Mr. Apodaca within 24 hours of its receipt. See Tr. Exh. 14. Plaintiff concedes it has no evidence of any actual confusion since June 2016. RT 9/25/18, 31:10-13.

20. As noted, since the domains at issue incorporate the marks, the fourth factor, similarity, cuts in Plaintiff's favor.

21.     As to the fifth factor, there is no evidence the parties use the same marketing channel during the relevant time—after Mr. Don Park's resignation. Even were there evidence that both Plaintiff and Defendants used the internet for marketing, the question would then be "whether both parties use the Web as a substantial marketing and advertising channel, whether the parties' marks are utilized in conjunction with Web-based products, and whether the parties' marketing channels overlap in any other way." Entrepreneur Media, 279 F.3d at 1151-52. Plaintiff offered no such evidence.

22.     The sixth Sleekcraft factor, the type of goods and degree of care likely to be exercised by the purchaser, much like the second factor, cuts heavily in favor of Defendants because there has been no evidence of any goods offered for sale by Defendants which could possibly be mistaken by purchasers who were trying to purchase goods by Plaintiff.

23.     The seventh factor, Defendants' intent in selecting the allegedly infringing mark, also cuts in Defendants' favor because here, Defendant Daniel Park, at the direction of Defendant Don Park, created and registered the allegedly infringing domains at a time before Plaintiff, or its predecessor entity, was even created. There was no intent to infringe or to create customer confusion at that time. Further, since Defendant Don Park's resignation, he has not used either domain to sell or market any competing product.

24.     The eighth and final Sleekcraft factor also favors Defendants, as there is no evidence that Plaintiff and Defendants are likely to expand to other product lines, certainly not other competing product lines.

25.     As a result, seven of the eight Sleekcraft factors weigh in favor of a finding of no likelihood of confusion, many of them heavily so. Further, two of the three "troika" of internet-infringement factors weigh heavily in favor of no likelihood of confusion. The Court finds Plaintiff has not met its burden to show a likelihood of confusion here.

26. The Court notes that in granting the preliminary injunction more than a year ago in this case, Judge Carter relied upon Defendants' concession at the time that goods were being promoted by both domain names, a concession upon which Judge Carter found the goods and services offered by the parties were related. See Dkt. 36 at 7. At trial, there was no such concession; to the contrary, Defendants offered undisputed evidence that they offered no goods or services, much less identical goods and services, using the domain names.

27. In sum, having considered all of the <u>Sleekcraft</u> factors, Plaintiff failed to show a likelihood of confusion and therefore cannot prevail on its first claim for trademark infringement.

### B. Claim Two: Cybersquatting

28. "In 1999, Congress passed the Anticybersquatting Consumer Protection Act ["ACPA"], 15 U.S.C. § 1125(d), as an amendment to the Lanham Act to prohibit cybersquatting." <u>Bosley Med. Inst., Inc. v. Kremer</u>, 403 F.3d 672, 680 (9th Cir. 2005).

29. "The statute is designed to reach activity that might otherwise fall outside the scope of the Lanham Act, i.e., the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another." <u>Cazorla v. Hughes</u>, No. CV1402112, 2014 WL 12235425, at *7 (C.D. Cal. Apr. 7, 2014).

30. To prevail on an ACPA claim, a plaintiff must prove the following:
(1) the defendant registered, trafficked in, or used a domain name;
(2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and
(3) the defendant acted "with bad faith intent to profit from that mark. <u>DSPT Int'l, Inc. v. Nahum</u>, 624 F.3d 1213, 1218-19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)(1)).

31. Although it is not required for general trademark liability, "[a] finding of 'bad faith' is an essential prerequisite to finding an ACPA violation." Interstellar Starship Servs., Ltd., 304 F.3d at 946. The ACPA enumerates nine nonexclusive factors for courts to consider in determining whether bad faith exists. See 15 U.S.C. § 1125(d)(1)(B)(i). The use of the listed criteria is permissive, Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 269 (4th Cir. 2001), and "the most important grounds for finding bad faith are the unique circumstances of the case," Interstellar Starship, 304 F.3d at 946 (quotation omitted). "Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii).

32. The non-exhaustive factors that a court may consider in determining whether a person has bad faith intent are:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i).

33. A bad faith determination "implicates three analyses:
(1) surveying the nine non-exclusive and permissive statutory factors that may be considered in determining whether a person has a bad faith intent;
(2) taking into account the unique circumstances of each case, which represent the most important grounds for finding bad faith, and which affect the examination (and weight) of the nine permissive factors as well as any other relevant considerations; and
(3) considering the availability of the safe harbor for any defendant who believed and had reasonable grounds to believe that the use of the domain

name was a fair use or otherwise lawful.

Rearden LLC, 683 F.3d at 1220 (citations and internal quotation marks omitted).

34. Using a domain name "to get leverage in a business dispute can establish 'bad faith intent'" under the ACPA. DSPT Int'l, Inc., 624 F.3d at 1219-20. In DSPT, Int'l Inc., the defendant, after content was removed from the website at issue, stated that he was "keeping [control over the website] as leverage in order to get money" he claimed the company owed him. Id. at 1221.

35. Here, Plaintiff argued that the "bad faith" prong was met by Defendants' filing a claim for arbitration, which Plaintiff infers was an attempt to use the domain names as leverage. See RT 9/25/18, 39:13-40:15. However, unlike in DSPT Int'l, Inc., Plaintiff did not prove that Defendants, in not turning over domains that they had registered and controlled, was an attempt to gain leverage in the dispute between the parties.

36. The Court finds Defendants did not use control over the domains here to gain leverage over Plaintiffs in a business dispute and did not otherwise act in bad faith. As a result, Plaintiff has not met its burden under the ACPA.

**C.   Claim Three: Conversion**

37. "In California, three elements comprise a cause of action for conversion. First, the plaintiff owned, possessed, or had the right to possess an item of personal property. Second, the defendant intentionally took wrongful possession of, disposed of, and/or prevented the plaintiff from having access to the property for a significant period of time. Third, the plaintiff was harmed by the defendant's actions." G and G Prods. LLC v. Rusic, 902 F.3d 940, 951 (9th Cir. 2018) (citations omitted).

38. Here, the domain names at issue in the conversion claim, "gizmoclosure.com" and "teaofakind.com," were created and registered prior to Plaintiff or its predecessor entity, Gizmo LLC, being formed as legal entities. The domain names were also registered in the name of Defendant Daniel Park,

who was not at the time or at any time thereafter, an employee of Plaintiff, at the direction of Defendant Don Park. There is no evidence that the ownership of the domain names was ever transferred to Plaintiff. Although Plaintiff offered evidence that it reimbursed one or more Defendants for renewal fees associated with the domain names for certain time periods well after their creation, Plaintiff has offered no evidence that such reimbursement was intended to or by operation of law acted as a transfer of ownership of the domain names to Plaintiff.

39. As a result, the Court finds that Plaintiff did not own, possess, or have a right to possess the domain names.

40. As Plaintiff did not own, possess, or have a right to possess the domain names, Defendants did not take wrongful possession or otherwise wrongfully prevent Plaintiff from having access to the domain names.

## III.
## NO REMAINING ISSUES TO BE DECIDED

Paragraph Seven of the FPTCO entered by the Court, and as stipulated by the parties, provides, in its entirety:

**7. REMAINING TRIABLE ISSUES**

In view of the admitted facts and the elements required to establish the claims, counterclaims and affirmative defenses, the following issues remain to be tried:

1. Whether Defendants misappropriated Plaintiffs' trademarks;

2. Whether Defendants committed cybersquatting;

3. Whether Defendants converted Plaintiff's property;

4. Whether the Court should issue a permanent injunction requiring Defendants to cease using, and turn over, the log-in information for the www.gizmoclosure.com and www.teaofakind.com domains.

FPTCO, ¶ 7. As set forth above, the Court has found in favor of Defendants as to Issues One, Two, and Three, and, by necessary implication, declines to enter a permanent injunction against Defendants and therefore rules as to Issue Four. The parties have presented no further issues for decision to the Court.[1]

## IV.
## CONCLUSION

Counsel for Defendants is directed to lodge a proposed judgment within seven (7) days from the date of this Order. Plaintiff shall have five (5) days from the date of lodging of the proposed judgment to file any objections to the proposed judgment.

Dated: January 09, 2019

                                          JOHN D. EARLY
                                          United States Magistrate Judge

---

[1] The Court notes that the FPTCO references Defendants' First Counterclaim. FPTCO at p. 8-9. However, the "elements" of the First Counterclaim set forth in the FPTCO are essentially defenses or alleged failures of proof of Plaintiff's claims. Id. Further, in the Prayer for Relief in support of their counterclaims, Defendants do not seek any relief in connection with their First Counterclaim. See Dkt. 12 at 23-24. In addition, to the extent Defendants' First Counterclaim asserted a claim or defense based upon an arbitration clause, this Court has already found such a claim to have been waived. See Dkt. 77. In addition, Defendants did not make any argument expressly relating to any counterclaim either during closing argument (see RT 9/27/18, 26:9-59:20) or in their post-trial brief (see Dkt. 87). Finally, and most significantly, as noted above, the parties presented only four issues for determination at trial and did not specify any counterclaims requiring determination.